IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

J. GORDON BLAU, et al.,            }
                                   }
        Appellants,                }
                                   }    CIVIL ACTION NO.
v.                                 }    09-AR-1324-NE
                                   }
BILL HEARD CHEVROLET               }
CORPORATION - ORLANDO, et          }
al.,                               }
                                   }
        Appellees.                 }

**<u>MEMORANDUM OPINION</u>**

This strange and convoluted case begins in 2001 with a putative class action filed in the Ninth Circuit Court, Orange County, Florida, civil case No. 05CA-6941, against Bill Heard Chevrolet Corporation - Orlando ("Heard-Orlando"), an automobile dealership. It was brought by Gary Riley, Carla Silver, and Stephen Silver, on behalf of themselves and similarly situated retail buyers who, over a decade, had financed purchases of automobiles from Heard-Orlando and paid hidden charges. The complaint alleges various violations of state and federal law. Enforcing a clause in Heard-Orlando's retail installment sales contracts, the Florida court sent the case to binding arbitration, case No. AAA 01-0124001, with H. David Luff, Esq. ("Luff") as arbitrator operating under the Federal Arbitration Act. J. Gordon Blau ("Blau"), and J. Gordon Blau, P.A. ("Blau, P.A."), Blau's law firm, were plaintiffs' counsel. They and their three individual clients are the appellants now before this court on appeal from the Bankruptcy Court for the Northern District of

Alabama. Hereinafter, appellants will be referred to as Blau, *et al.*

After more than seven (7) years in arbitration, a settlement between the three individuals and the class, as plaintiffs, and Heard-Orlando as defendant, was finally reached by letter agreement on April 25, 2008. (AP Doc. 31 Ex. D). On that date Heard-Orlando's arbitration counsel, Latham, Shuker, Eden & Beaudine, LLP, ("Latham Shuker"), wrote Blau to memorialize the terms of the settlement, agreeing that Heard-Orlando would pay $51,000 to the three named plaintiffs and $1.1 million to Blau and Blau, P.A., as their fees as plaintiffs' class counsel. Although the acknowledgment letter did not address orally understood loose ends, such as the benefits to be paid to class members other than the named plaintiffs, the joint motion later filed by the parties, requesting approval by the arbitrator, included a provision that a coupon would be issued by Heard-Orlando to each class member by Heard-Orlando redeemable for $100 in goods or services. (AP Doc. 31 Ex. H). When the settlement was reached, Blau, *et al*, did not know that Heard-Orlando was in the process of suing its insurance company for coverage with which to pay Blau *et al*. For aught appearing to Blau, *et al*, the settlement money was coming directly from Heard-Orlando, which at the time appeared to be a viable and prosperous automobile dealer. On August 6, 2008, Luff approved the joint settlement preliminarily, anticipating that notice of the settlement would be given to the class, but not expecting that Heard-Orlando would declare bankruptcy

before the effectuation and final approval of the settlement.

## The Coverage Lawsuit

As noted above, during the pendency of the arbitration, without notice to Blau, *et al*, or to Luff, Heard-Orlando filed a separate coverage lawsuit against its liability insurer, Universal Underwriters ("Universal"), alleging breach of contract and bad faith failure to defend, and seeking indemnity for any damages assessed against Heard-Orlando in the arbitration proceeding. On May 22, 2008, approximately one month after Heard-Orlando formally agreed to the settlement with Blau, *et al*, Heard-Orlando settled its collateral coverage suit with Universal. (AP Doc. 31 Ex. A). The insurer was represented by Bohdan Neswiacheny, a Florida law firm. The separate settlement agreement between Universal and Heard-Orlando provided that Universal would pay "to Bill Heard, care of counsel," the sum of $2,105,050.34. To effectuate the said settlement, Universal transferred funds via two checks, one for $1,597,133.13, and one for $507,917.21, both payable to the client trust account of Latham Shuker, the law firm that represented Heard-Orlando both in its defense of the arbitration proceeding and in the declaratory action against Universal. (AP Doc. 31 Ex. B). Such a client escrow account is known in Florida as an IOTA account, the equivalent of an IOLTA account in Alabama. It was not until long after Heard-Orlando's subsequent bankruptcy that Blau asked Bohdan Neswiacheny to explain the terms of the settlement between Universal

and Heard-Orlando. Universal's first check for $507,917.21 was specifically designated for attorneys' fees and costs to Latham Shuker for defending Heard-Orlando in the arbitration class action. The second check in the amount of $1,597,133.13 was specifically designated as $1,450,000 with which to satisfy the arbitration award against Heard-Orlando in favor of Blau, *et al*, plus $147,133.13 to Latham Shuker for their services and costs incurred in prosecuting Heard-Orlando's separate coverage lawsuit against Universal. (Appeal Doc. 3 Ex. A). On July 14, 2009, in a revealing letter from Bohdan Neswiacheny to Blau, Bohdan Neswiacheny represented, *inter alia*:

**What is clear from all of the documentation is that the $1,450,000 that was paid by Universal Underwriters Insurance Company was to fund the Class Action Arbitration Settlement.**

*Id.* (emphasis added). This made clear what was previously unclear, namely, that Universal never intended to make a sizable contribution to Heard-Orlando's creditors, that is, except to Blau, *et al*, and Heard-Orlando's law firm. No check was ever written by Universal payable directly to Heard-Orlando. All checks were payable to Latham Shuker, as counsel for Heard-Orlando, in total compliance with the settlement agreement.

Although the original putative class action named Fidelity & Deposit Company of Maryland as a secondary defendant, that entity is never thereafter mentioned in the record and will be ignored by this court as it was by the bankruptcy court.

**The Settlement between Heard-Orlando and Blau, *et al***

On July 28, 2008, at a status conference conducted by arbitrator Luff, the parties represented that the settlement as above described had been reached, whereupon Luff found that the settlement was fair and adequate, and that the proposed means of class notice was also reasonable. (AP Doc. 31 at 28).  Luff was not informed of the existence of, much less the terms of, any separate settlement between Heard-Orlando and Universal. On August 6, 2008, Heard-Orlando and Blau, *et al*, submitted to Luff a formal joint Motion for Preliminary Approval of Class Settlement. (AP Doc. 31 Ex. H). On the same day, Luff entered a "Class Action Settlement Preliminary Approval Order." (AP Doc. 31 Ex. I). The order certified the class as described and provided that "objections to the proposed settlement will be considered by the arbitrator only if served on Class counsel in writing and postmarked on or before September 29, 2008." Luff scheduled a hearing for October 9, 2008 to decide upon whether to give his final approval to the settlement in light of any possible objections. *Id.*  Class notice was given by publication in the Orlando Sentinel on September 25, 2008. (AP Doc. 31 Ex. J) If there were any objections filed by class members, this court assumes that such information would have been shared with the bankruptcy court and therefore with this court. This court knows of no such objections.

On August 22, 2008, at the direction of Bill Heard Enterprises, Inc. (BHE), which is a separate corporate entity that was never a

party to the Florida arbitration proceeding and that ostensibly was not a client of Latham Shuker, but that is Heard-Orlando's corporate parent (and a company then facing imminent bankruptcy), Latham Shuker transferred most of the funds it had received from Universal to the IOLTA account of the law firm of Burr & Forman in Birmingham, Alabama, for credit to BHE. (AP Doc. 49 (memorandum opinion of the bankruptcy court) at 5). If BHE had any right to give such an order to Latham Shuker, the basis for it does not appear.

Upon Blau, *et al*'s motion filed with Luff to compel payment of the settlement, Luff, on August 28, 2008, expressly held that his order of August 6, 2008, mandated that the settlement payment be made by Heard-Orlando to Blau, *et al*, no later than August 20, 2008, and ordered Heard-Orlando immediately to transfer the said funds, along with interest accrued from August 20 to August 28, to Blau's trust account. (AP Doc. 31 Ex. P). Heard-Orlando and BHE ignored Luff's said order. (AP Doc. 49 at 5). By August 20, 2008 Latham Shuker had paid itself what it, as a law firm, was owed under the settlement agreement from the funds escrowed with it, and two days later Burr & Forman began to hold the remainder of the Universal settlement funds in its IOLTA account. On September 11, 2008, counsel for Heard-Orlando explained to Luff that Heard-Orlando believed that it had no duty to transfer any funds to Blau, *et al*, no matter from whatever source, because Luff had only given "preliminary" approval to the class settlement. (AP Doc. 31 Ex. K).

The arbitrator strongly disagreed with counsel for Heard-Orlando, making it clear that the order he signed on August 6, 2008 required a transfer of the settlement funds to Blau no later than August 20, 2008. *Id.* In a formal order issued on September 15, 2008, Luff held that Heard-Orlando had committed a "willful violation of this tribunal's August 6, 2008 and August 28, 2008 Orders." (AP Doc. 1 Ex. F). There is nothing in the record to reflect that at the time Luff ordered the payment to Blau, *et al*, either he or Blau, *et al*, knew of the settlement between Heard-Orlando and Universal or the mechanical treatment given the settlement funds. As stated, it would be pure speculation to suggest that BHE was a client of Latham Shuker when it paid itself what it was owed from the Universal funds escrowed by it. Whether Luff ever learned of the precise terms of the Heard-Orlando settlement with Universal, it is a matter conspicuously absent from the record.

After notice to the class was published in the Orlando Sentinel on September 25, 2008 (AP Doc. 31 Ex. J), the arbitration proceeding lay dormant for nearly a year while BHE, Heard-Orlando, and Blau, *et al*, fought in the bankruptcy court, all as more fully described below. On August 4, 2009, Luff signed a final settlement approval order. (Appeal Doc. 10 Appx.). Whether the automatic stay was in place when Luff placed his final imprimatur on the settlement is a matter of debate.

**The Bankruptcy**

On September 28, 2008, three days after publication of the class notice and a month after Luff's orders could only be described as unequivocal, BHE and all of its subsidiaries, including Heard-Orlando, all represented by the law firm Burr & Forman, filed a voluntary petition in bankruptcy under Chapter 11 in the Northern District of Alabama. On December 16, 2008, Blau *et al*, who were represented in the bankruptcy court by the law firm Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson"), filed a motion on behalf of Blau, *et al*, for relief from the automatic stay, asking that the  court allow Blau, *et al*, to proceed with implementation of the arbitrator's order in Florida. (BP Doc. 953). Blau, *et al*, were at that time unaware of the terms of the settlement between Heard-Orlando and Universal. On January 20, 2009, Heard-Orlando countered with an adversary proceeding against Blau, *et al*, (A.P. Doc. 1), seeking a declaration that Blau, *et al*, are not entitled to anything from Heard-Orlando's settlement with Universal, and that the $1.1 million dollars transferred on August 22, 2008 from Latham Shuker's client trust account to Burr & Forman's client trust account for the benefit of BHE is property of the debtors' estate within the meaning of 11 U.S.C. § 541. *Id.* In the adversary complaint Heard-Orlando alleged that "[i]n anticipation of settling [the arbitration case] Heard Orlando voluntarily transferred $1.1 million (the "Disputed Funds") to Latham Shuker." (AP Doc. 1 at ¶ 18). This allegation was wholly inaccurate. In fact, it was

Universal, not Heard-Orlando, that transferred funds into Latham
Shuker's IOTA account, something Blau, *et al*, and the bankruptcy
court would only later learn. As stated above, because the record
does not reflect otherwise, it is obvious that Latham Shuker paid
itself from the Universal settlement proceeds before it transferred
the escrowed balance to Burr & Forman's IOLTA account at BHE's
direction. In other words, Heard-Orlando's obligation to Latham
Shuker, as attorneys, was paid by Universal at a time when Heard-
Orlando, Latham Shuker's client, was lurching, along with BHE,
toward bankruptcy. Neither the attorneys' fees of Blau and Blau,
P.A., nor of Latham Shuker were approved by the bankruptcy court.
In other words, only one set of lawyers who participated in the
arbitration proceeding has been paid. Nobody, including Heard-
Orlando, complains about Latham Shuker's being compensated out of
Universal's pocket from funds in Latham Shuker's IOTA account held
to the credit of Heard-Orlando.

Blau, *et al*'s motion for relief from the stay was combined by
the bankruptcy court with Heard-Orlando's adversary proceeding. On
February 3, 2009, the bankruptcy court granted Blau, *et al*'s motion
for relief from stay but found for some then unarticulated reason
that Blau, *et al*, through Baker Donelson, had conceded that the
funds received from the Universal settlement were property of the
debtor's estate. (AP Docs. 10 and 11). Blau, *et al*, promptly filed
a motion for relief from said order, asking the court to vacate its

erroneous finding that Blau, *et al*, had conceded the issue of entitlement to the Universal settlement funds. (AP Doc. 16). On February 17, 2009, the bankruptcy court entered an order finding that it "was premature in consolidating the adversary proceeding with the motion for relief from stay and finding that the disputed funds are property of the estate," upheld its order granting Blau, *et al*, relief from the stay, and retreated from any conclusion concerning the funds being part of the debtor's estate, thus reinstating the adversary proceeding. (AP Doc. 17).

On March 31, 2009, the bankruptcy court held an initial pre-trial conference in the adversary proceeding. Based on an agreement between counsel, the bankruptcy court extended until April 7, 2009 the deadline for Blau, *et al*, to answer the adversary complaint, and rescheduled the pre-trial conference to April 15, 2009. (AP Doc. 23). By subsequent agreement between the parties, the time for Blau, *et al*, to file their answer was again extended to April 14, 2009. (AP Doc. 49 at 2). On April 6, 2009, Baker Donelson, counsel for Blau, *et al,* unexpectedly filed a motion to withdraw. (AP Doc. 25). On the same day the bankruptcy court granted Baker Donelson's said motion, without holding a hearing, and without insisting that any other counsel enter an appearance for Blau, *et al.* (AP Doc. 26). The bankruptcy court subsequently acknowledged that it was hasty in allowing Baker Donelson to withdraw without a simultaneous appearance by substitute counsel. (Transcript of hearing on April

15, 2009). The bankruptcy court never mentioned the fact that Blau, P.A., an artificial entity, could not, under federal procedural rules, appear without counsel.

On April 15, 2009, the bankruptcy court began another pre-trial conference. Stuart Maples, an attorney licensed to practice in the Northern District of Alabama, attended the hearing, while making it clear that he was not entering an appearance for Blau, *et al*, and was only exploring the possibility of undertaking the representation. Blau himself participated by telephone. Blau, a Florida lawyer, was not licensed to practice in the Northern District of Alabama. He did not seek *pro hac vice* status, although he did ask the bankruptcy court about that possibility, to which the bankruptcy court gave an enigmatic answer. Blau begged the court not to enter default because Blau, *et al*, still had not retained counsel. (Transcript of hearing on April 15, 2009). The bankruptcy court orally granted a two-week extension of the deadline for Blau, *et al*, to answer, "set[ting] an absolute ... deadline [of April 29, 2009] for an answer to be filed." The bankruptcy court stated in the recorded telephone conversation that it would be "looking for an entry of default" if the new deadline was missed, and Blau responded that he "appreciated the two-week extension" and that he would "certainly have that answer within a two-week period." *Id.* No minute entry was made on the docket sheet to memorialize the oral order, and no written order was ever entered setting April 29, 2009 as the

new and final deadline. In other words, the new deadline was not electronically accessible to any attorney who might be contemplating an appearance for Blau, *et al*.

After the April 15, 2009 hearing, Blau, *et al*, succeeded in getting a lawyer, namely, Frank Hilton Tomlinson ("Tomlinson"). According to both Blau and Tomlinson, when Blau first spoke to Tomlinson, Blau told him that the bankruptcy court had given Blau, *et al*, until the close of business on May 1, 2009, to file their answer. (AP Doc. 45 Ex. C (affidavit of Blau)). Tomlinson had no reason not to believe Blau, but nevertheless, out of an abundance of caution, Tomlinson personally checked the bankruptcy court docket sheet and found nothing to indicate that Blau was incorrect in his recollection of the oral order that Blau shared with Tomlinson.

At the close of business on April 29, 2009, no answer having been filed, Heard-Orlando filed a motion for entry of default. (AP Doc. 29). The motion, for some unknown reason, was electronically served on Baker Donelson, the firm that had already withdrawn and was no longer counsel for Blau, *et al*. Heard-Orlando was, at that time, unaware of Tomlinson's engagement by Blau, *et al*, and understandably did not serve Tomlinson. On April 30, 2009, at 1:41 p.m., the clerk made a docket entry of default, citing failure to plead pursuant to Bankruptcy Rule 7055. (AP Doc. 30). What the clerk would have done if Tomlinson had filed an answer for Blau, *et al*, earlier than 1:41 p.m. is anyone's guess. At 3:49 p.m. the same day,

Blau, *et al*, filed their answer, counterclaim, and a third-party complaint against BHE. (AP Doc. 31). This pleading, filed by Tomlinson, obviously could not have been prepared by him between 1:41 p.m., when the default was entered, and 3:49 p.m., when he filed the answer.

On May 1, 2009, reacting with blinding speed to the entry of default, Tomlinson filed a motion to set aside the entry of default and to reinstate the adversary proceeding. (AP Doc. 32). On May 6, 2009, the bankruptcy court held a hearing on Blau, *et al*'s said motion to set aside. At that hearing Tomlinson explained that Blau had told him that the answer was not due until May 1, 2009, and that he had beaten what he thought was the deadline. (Transcript of hearing on May 6, 2009). **The said hearing of May 6, 2009 only dealt with Blau, *et al's* motion to set aside the entry of default and not with the motion for final default judgment that Heard-Orlando had filed on May 5, 2009, the day before the May 6, 2009 hearing.** On May 8, 2009 Heard-Orlando's intervening May 5, 2009 motion for entry of final default judgment, upon which there had been no hearing, was granted, and a final default judgment was entered against Blau, *et al*. (AP Doc. 38). Simultaneously, the bankruptcy court entered an order denying Blau, *et al*'s motion to set aside the entry of default. (AP Doc. 41). On May 18, 2009 Blau, *et al*, filed a motion for relief from judgment, invoking both Rule 59 and Rule 60(b), F.R.

Civ. P.,  rules that are applicable in the bankruptcy court by
virtue of Bankruptcy Rules 9023 and 9024(b). (AP Doc. 45). On June
8, 2009, without conducting a hearing, the bankruptcy court denied
Blau, *et al*'s motion for post-judgment relief, finding that Blau,
*et al*, lacked a meritorious defense, and had engaged in culpable
conduct, and that setting aside the default judgment would prejudice
Heard-Orlando. (AP Docs. 49 and 50). On June 10, 2009, Blau, *et al*,
filed their notice of appeal to this court. (AP Doc. 51).

### Issues on Appeal

Consistent with logic, Blau, *et al*, first complain about the
bankruptcy court's denial of their motion to set aside the entry of
default. Their second, or alternative, complaint is that it was
error to deny their motion for relief from the final default
judgment. If the clerk's mere **entry of default** should have been set
aside under Rule 55(c), the subsequent purported **final default
judgment** and the rulings on Blau, *et al*'s post-judgment motions were
heard upon a false premise and became expressions on moot questions.
This court's review of the first question, namely, the refusal to
set aside the **entry** of default pursuant to Rule 55(c), is for "abuse
of discretion". But, the standard under Rule 55(c) for **setting aside
an entry of default** and the standard under Rule 60(b) for **setting
aside a final default judgment** are not the same. Professor Moore
makes this distinction as follows:

To some extent, the policy in favor of setting default judgments aside is enshrined in the Federal Rules of Civil Procedure themselves. Rule 60(b) is not the only rule covering defaults. Defaults are also treated in Rule 55(c), which authorizes a court to "set aside an entry of default for good cause." **Of course, there is a distinction between the mere entry of a default and a default judgment.** If a default **judgment** has been rendered, Rule 55(c) provides that the court may set aside the judgment "under Rule 60(b)."

Logically, this distinction between defaults and default judgment should mean that "[l]ess substantial grounds may be adequate for setting aside a default standing alone than would be required for opening a judgment." The standard formulation of the distinction is:

> A *default* can be set aside under Rule 55(c) for "good cause shown," but a default that has become final as a *judgment* can be set aside only under the stricter Rule 60(b) standards for setting aside final, appealable orders.

14 James Wm. Moore et al., Moore's Federal Practice § 60.22[3][b] (3d ed. 2008)(emphasis added, italics in original).

This court has not found an Eleventh Circuit case that expressly recognizes Professor Moore's distinction. In fact, most courts fail to appreciate the distinction that the differing language in Rule 55(c) and in Rule 60(b) necessarily implies, a distinction that adds emphasis to the universally recognized principle that defaults are not favored in the law. *See*, *e.g.*, *Feliciano v. Reliant Tool Co., Ltd.,* 691 F.2d 653, 656 (3d. Cir. 1982); *United States v. Di Mucci*, 879 F.2d 1488, 1495 (7th Cir. 1989); *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984); *United Coin Meter Co., Inc. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th

Cir. 1983). This court will assume *arguendo* that Professor Moore's distinction is valid, an assumption that necessarily leads this court to conclude that the bankruptcy court's denial of the motion to set aside the mere **entry** of default, routinely noted by the **clerk** and not entered by the court, was an abuse of discretion. As this court understands the concept "good cause" as these words are used in Rule 55(c), Blau *et al*, demonstrated very "good cause" for setting aside the mere entry of default. Before the clerk's routine entry, the bankruptcy court had summarily allowed counsel for Blau, *et al,* to withdraw, leaving all five defendants without counsel. Furthermore, Blau, P.A., is not a natural person and therefore could not proceed *pro se*. *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202-03 (1993); *In re Shattuck*, 2009 WL 2252326, at *3; *Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 37-38 (D.D.C. 2007). A professional association must have a lawyer licensed to practice law in a federal court proceeding. *Id.* Blau, *et al*, obviously were having difficulty in obtaining counsel to substitute for Baker Donelson. Because Blau himself was not counsel for any party **in this case**, any personal culpability arising out of his shortcomings could not be attributed to the entities that he did not represent **in this case**. There is no reason to believe that Tomlinson was not telling the truth when he recounted that Blau told him that May 1, 2009 was the deadline. Tomlinson himself was

wholly without fault, and Blau's misconduct, if culpable, could only be blamed on Blau. Tomlinson obviously and fervently wanted to meet what he erroneously believed to be the new deadline. He was given no benefit of the doubt by the bankruptcy court.

In logical sequence, a timely motion to set aside a clerk's mere **entry** of default must be ruled upon and **denied** before any motion for a motion for final default judgment can be addressed, much less **granted**. Unless and until the motion to set aside the entry of default is denied, a motion for final default judgment is just hanging around. This sequential consideration helps to explain Professor Moore's above-quoted distinction between an entry of default and a default judgment. The standard for post-judgment reconsideration of the two orders is not the same. The bankruptcy court apparently employed the standard set forth in Rule 60(b) when ruling at the same time on Blau, *et al*'s Rule 55(c) motion and on Heard-Orlando's later filed  motion for final default judgment. The court also made no such distinction when it found Blau culpable, found that Heard-Orlando had been prejudiced, and found a lack of a meritorious defense by Blau, *et al*.

The bankruptcy court was correct, of course, in recognizing the Eleventh Circuit's position that the "good cause" necessary to set aside a "default", whether under Rule 55(c) or Rule 60(b), "is not susceptible to a precise formula, but some general guidelines are commonly applied." *Compania Interamericana Export-Import S.A. v.*

*Compania Dominica de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996). These guidelines are "whether the default was culpable or willful, whether setting it aside would prejudice the adversary, and whether the defaulting party presents a meritorious defense.*" Id.* In *Worldwide Web Systems, Inc. v. Feltman (In re Worldwide Systems, Inc.)*, 328 F.3d 1291, 1295 (11th Cir. 2003), the Eleventh Circuit, in addressing a Rule 60(b) motion, held that to be entitled to relief from **final judgment**, a party must show that: "(1) it had a meritorious defense that might have affected the outcome; (2) granting the motion would not result in prejudice to the non-defaulting party; and (3) a good reason existed for failing to reply to the complaint." The Eleventh Circuit's discussion of Rule 60(b) without a discussion of Rule 55(c) implies, if it does not express, agreement with Professor Moore's distinction between the standard for review of a default **judgment** and a mere **entry** of default.

In all of this, it must be remembered that when ruling on a default, whether under Rule 60(b) or under Rule 55(c), a *nisi prius* court's discretion is not unbridled. It is constrained by the universal disfavor of defaults as a means of dispute resolution.

### Does Blau, *et al*, have a Meritorious Defense?

Despite this court's opinion that a meritorious defense is not the *sine qua non* for a finding of the "good cause" necessary for setting aside a mere entry of default, the court will proceed on the contrary assumption, namely, that there is no distinction between

how to rule on a Rule 55(c) motion and on a Rule 60(b) motion.

> The requirement that a party moving for relief from a judgment **under Rule 60(b)** must show a "meritorious" claim or defense does not mean that the moving party must show that he or she is likely to prevail. The frequently quoted standard is that the moving party must make allegations that, *if established at trial*, would constitute a valid claim or defense. It has also been stated that allegations attempting to state a claim or defense in this context are "meritorious if they contain 'even a hint of a suggestion' which, if proven at trial, would constitute a [valid claim or a] complete defense." *Keegel v. Key West & Caribbean Trading Co., Inc.*, 627 F.2d 372, 374 (D.C. Cir. 1980)(quoting *Moldwood Corp v. Stutts*, 410 F.2d 351, 352 (5th Cir. 1969)).

14 James Wm. Moore et al., Moore's Federal Practice § 60.22[2] (3d ed. 2008)(emphasis added; italics in original)(internal citations omitted). This court emphasizes, again, that Professor Moore is here discussing Rule 60(b) and not Rule 55(c). In order to obtain relief from final judgment, much less for setting aside a mere entry of default, it was not necessary for Blau, *et al*, to prove to the bankruptcy court **that Blau, *et al*, will prevail**. It was only necessary that they state a position that is not lacking in colorable merit and that does not constitute a Rule 11 violation.

Blau, *et al*'s alleged defense and the basis for their counterclaim is that under principles of equity a constructive trust was placed on that part of the proceeds paid by Universal to Heard-Orlando's counsel in settlement of the coverage lawsuit, money expressly designated by Universal, and understood by Heard-Orlando's counsel, to be in satisfaction of the arbitration award. Heard-

Orlando argues that there is no colorable merit to Blau, *et al*'s said contention because the funds from Universal were never put in an escrow account expressly for Blau, *et al*, and/or because the arbitration process was not final at the time of Heard-Orlando's bankruptcy petition.

In contemporaneously denying Blau, *et al*'s post-**entry** and post-**judgment** motions, the bankruptcy court simply found that the insurance proceeds paid to Heard-Orlando by Universal were "in settlement of a separate coverage lawsuit," and that the agreement between Heard-Orlando and Universal did not specify that the funds were to be placed in escrow **expressly for Blau, *et al***. (Ap Doc. 49 (memorandum opinion) at 7). The court also opined that Blau, *et al*, "overlook the fact that the pending settlement in the underlying arbitration action was not finalized before Bill Heard filed for bankruptcy relief." *Id.* Blau, *et al*, do not overlook this fact. Instead, they simply deny that the said fact has ultimate significance.

Under Florida law "[n]o person who is not an insured under the terms of a liability insurance policy shall have any interest in such policy, either as a third-party beneficiary or otherwise, prior to first obtaining a **settlement** or verdict against a person who is an insured under the terms of such policy for a cause of action which is covered by such policy." Fla. Stat. Ann. § 627.4136 (emphasis added); *Allstate Ins. Co v Stanley*, 282 F. Supp. 2d 1342

(M.D. Fla. 2003). If it were clear beyond doubt that no "settlement" had been reached between Blau, *et al*, and Heard-Orlando before the money was paid over by Universal, the claim of a constructive trust, or the claim that Blau, *et al*, had a beneficial interest in the settlement proceeds, might not meet the Florida standard. But, such is not the case. It is true that when the bankruptcy petition was filed the arbitrator had only signed an order styled "preliminary approval". But Luff's clear order of August 28, 2008, issued before the bankruptcy, mandated that Heard-Orlando transfer the funds to Blau, *et al*. This order was reaffirmed by Luff in even more categorical terms at the hearing of September 11, 2008, and again in the September 15, 2008 order that followed it. The arbitrator, acting under the Federal Arbitration Act, **held** finally and dispositively that Heard-Orlando should have transferred the funds no later than August 20, 2008. This holding constituted a binding determination that a "settlement" under Florida law had been reached. While an arbitrator's unchallenged decisions are incontrovertably binding on the parties, an arbitrator does have a problem when a party violates his order. Administering appropriate sanctions under such circumstances is such a difficult task that, as a practical matter, it is impossible. As this court understands the undisputed facts in this case, if Blau, *et al*, are not entitled to summary judgment, they do present triable issues of fact and law.

Arbitration is, of course, a well recognized means of dispute

resolution. An arbitrator's order is just as binding on the parties as is a court order, that is, unless and until that order is set aside by a court of competent jurisdiction. According to Luff, a "settlement" had been reached. He unambiguously confirmed to the parties that the disputed funds were due to be transferred to Blau's trust account no later than August 20, 2008, two days before BHE's bankruptcy counsel ordered Latham Shuker, Heard-Orlando's counsel, to transfer the funds from its IOTA account to their IOLTA account. This was approximately a month and a half before Heard-Orlando actually filed for bankruptcy. That a "settlement" had, in fact and law, been reached, if it does not mandate a disposition in favor of Blau, *et al*, under Rule 56, is a "meritorious" defense and must be considered on its merits.

As a basis for denying both Blau, *et al*'s Rule 55(c) motion and their subsequent Rule 60(b) motion, the bankruptcy court cited *Pixton v. B & B Plastics, Inc. (In re B & B Plastics, Inc.)*, No. 04-2369-BKC-PGH-A, 2005 WL 3198656 (Bankr. S.D. Fla. Aug. 10, 2005) for the proposition that under Blau, *et al*'s circumstances there could be no constructive trust. In the first place, *In re B & B*, which is just as heavily relied upon by Heard-Orlando in this court as it was in the bankruptcy court, is an unreported case. In the second place, it comes from a court whose decision, even if it had been published, is not binding on this court. Thirdly, *In re B & B* involved a debtor whose own funds were held in its attorney's client trust account.

22

Pre-petition, a court there ordered the debtor's attorney to transfer his client's funds to an interest bearing escrow account. The debtor's attorney ignored the court's order. When the debtor later filed for bankruptcy, a judgment that was thereafter obtained against the debtor in an entirely separate case caused those who obtained the post-petition judgment to seek to recover the debtor's money that should have been escrowed pre-petition a different way. The bankruptcy court in that case held that despite the debtor's attorney's disobeying the district court's order, the funds in fact became property of the bankruptcy estate because there had been no written escrow agreement between the affected parties. Even if *In re B & B* were binding on this court, and it is not, that case does not prove the absence of a constructive trust in the present case. A key difference between *In re B & B* and this case is that in *In re B & B* the money was  undisputedly the **debtor's own money,** even if its lawyer had failed to comply with an order that he place it in an interest bearing trust account. This set of facts is markedly different from an insurance company's depositing **its** money in settlement of a coverage lawsuit against **it** into a lawyer's trust account designated for limited purposes, including payment of the debtor's pre-petition liability to certain named parties. This court is not persuaded by *In re B & B*. The parties to this appeal have not cited a case that directly mimics this case, and the absence of such a case is, in itself, significant. There is, of course, persuasive

authority for the simple proposition that a constructive trust is placed on funds deposited pre-petition into a debtor's trust account if clearly meant for the benefit of another. *See Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55-56 (5th Cir. 1993); *In re Scanlon*, 239 F.3d 1195 (11th Cir. 2001); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir. 1987); *In re Correct Mfg. Corp.*, 88 B.R. 158, 162 (Bankr. S.D. Ohio 1988); *In re Fagan*, 166 B.R. 531, 535-536 (Bankr. E.D.N.Y. 1993). The existence of conflicting authority on this issue suggests, if nothing else, that Blau, *et al*, have a "meritorious" claim to the proceeds, a claim that deserves serious judicial consideration. When the bankruptcy court found Blau, *et al*'s claim devoid of merit, it either misstated the law or abused its discretion, or both.

Although this court has decided that Blau, *et al*, has a meritorious defense, it must not only consider whether the constructive trust theory has merit, but whether Blau, *et al*, have any other legitimately arguable theories. The first theory that occurs to this court is the "judicial estoppel" that arose from the arbitrator's orders. The only difference between an arbitration order entered pursuant to the scheme created by the Federal Arbitration Act and a court's order is that the arbitrator's order is not appealable, and can be attacked only for an undisclosed conflict of interest, or the like. It cannot be attacked for a mere error of law, or even for an abuse of discretion. Heard-Orlando and

24

Blau, *et al*, were both parties or privies to the arbitration proceeding before Luff. His orders were either final and binding on them or are due great deference in any subsequent court proceeding. The bankruptcy court did not concede or discuss the effect of the arbitrator's orders. A third arguably meritorious claim by Blau, *et al*, to Universal's money is "unjust enrichment". Why should other creditors of Heard-Orlando feast at a banquet provisioned by Blau, *et al*? Should the debtor's estate be greatly enhanced at the expense of Blau, *et al*, who litigated with Heard-Orlando for seven years and finally obtained an order of entitlement for themselves and the class before Heard-Orlando settled its separate coverage suit with its insurance company, and entered an agreement that undisputedly was implemented by the insurance company's counsel and by Heard-Orlando's counsel, but that was intercepted by Heard-Orlando's bankruptcy counsel and put in storage while BHE and its affiliates planned their Chapter 11 petition. Why did the bankruptcy court not find that the money that was forwarded by Universal and expressly earmarked for the payment of Heard-Orlando's obligation to its Orlando counsel was not just as much a part of Heard-Orlando's bankruptcy estate as was the money that Universal expected to be paid over to Blau, *et al*? The money kept by Latham Shuker for its attorneys' fees in two different cases was no more "earmarked" than the rest of Universal's settlement funds was "earmarked". And, if the $1,100,000 earmarked for Blau, *et al*, becomes a part of the

debtor's estate, because money is a fungible commodity, Burr &
Forman, Heard-Orlando's bankruptcy counsel, will be paid out of
Universal's money, while the law firm that worked for seven years on
the class action will not be paid what Heard-Orlando was ordered to
pay it.

### Will Heard-Orlando be Unduly Prejudiced?

When the bankruptcy court decided not to grant Blau, *et al*,
relief from judgment, it reasoned, *inter alia*, that "[t]he debtor's
bankruptcy is highly complex and fast moving." (AP Doc. 49
(memorandum opinion) at 8). The court further justified its refusal
to reopen the matter by recalling that when it temporarily lifted
the stay and allowed Blau, *et al*, to pursue their class action
against Heard-Orlando, it was relying on the representation by Blau,
*et al*, that they would not seek the "pre-petition settlement funds."
*Id.* **Which** "pre-petition settlement funds" was the bankruptcy court
and/or Blau, *et al*, talking about? Blau, *et al*, of course understood
that they had reached a pre-petition settlement with Heard-Orlando
pre-petition, but they did not know about a pre-petition settlement
between Heard-Orlando and Universal. In particular, they did not
know the relevant facts about the settlement upon which they base
their present claim of constructive trust, or any other arguable or
equitable basis for their entitlement to the funds. And, how was
**Heard-Orlando** prejudiced by such a representation?

Clerical entries of default are regularly and routinely set

aside by courts. Final default judgments are less often set aside, but without much regard being paid to the delay that is inherent in any reopening of contentious litigation. This court hopefully assumes that the contested settlement funds are not yet being treated as part of any reorganization or distribution plan proposed by BHE and its affiliates under Chapter 11. In truth, to have considered Blau, *et al*'s answer, counterclaim and third-party complaint on their merits might have made this bankruptcy case **less complex** and **faster moving** than it is now. The universal presumption against "default" as a means of dispute resolution implies the need to balance "fairness" for the party who obtained a default with the "fairness" due the defaulting party. Blau, *et al*, filed their answer less than one day after the orally ordered new deadline and less than one day after the clerk entered default on a motion that had not been served on Tomlinson. Blau, *et al*, moved to set aside the entry of default on May 1, 2009, the day that Tomlinson thought was the deadline. On May 8, 2009, the bankruptcy court not only denied Blau, *et al*'s motion to set aside the **entry** of default, but simultaneously entered a **final judgment** against them. Ten days later, on May 18, 2009, Blau, *et al*, filed a timely motion for relief from judgment. No matter how fast moving and complex the underlying bankruptcy proceeding was, or is, it is doubtful that setting aside the entry of default and the later the default judgment would have been unduly prejudicial to Heard-Orlando and/or

to BHE and/or to their creditors, particularly considering the injustice that was occasioned, in whole or in part, by the sudden withdrawal of Baker Donelson and the fact that Blau, *et al*, were unrepresented when the default was entered by the clerk.

When Blau, *et al*, with their previous counsel, sought relief from the stay, they represented to the bankruptcy court that they would not claim "pre-petition settlement funds". How can this be reconciled with their answer and counterclaim filed on April 30, 2009, in which they do make a claim to "pre-petition settlement funds"? Assuming *arguendo* that this reversal of course caused some prejudice to Heard-Orlando, the change of mind and the concomitant confusion can be traced to Heard-Orlando's failure to disclose the fact to Blau, *et al*, that the "pre-petition settlement funds" came from Universal to Latham Shuker's client trust account and then to Burr & Forman's client trust account, all with strings attached by Universal. (AP Doc. 1 ¶ 18). If insurance proceeds had been paid directly to Heard-Orlando and only thereafter paid over by Heard-Orlando to Latham Shuker, as Heard-Orlando alleged in its adversary complaint, the situation would be different and might be analogous to *In re B & B*. In such an event Blau, *et al*'s argument for a constructive trust would be less persuasive. But Blau, *et al*, only learned after they filed their motion for relief from the stay that when Universal's settlement funds were disbursed the funds were restricted by specific instructions to Heard-Orlando's counsel. The

funds were never in the physical custody or control of Heard-Orlando. The fact that the funds were paid by an insurer in full settlement of its potential liability not only to Heard-Orlando and its counsel but to Blau, *et al*, is powerful evidence of the creation of a constructive trust.

To subtract over a million dollars from Heard-Orlando's parent and/or sister corporations and their creditors, money that was never intended for them, would be no more "prejudicial" to them than if the "pre-petition settlement", insofar as it was earmarked for Blau, *et al*, had been paid directly to Blau, *et al*. In fact, Universal may have been "prejudiced" by the misdirection of its money. There was simply no sufficient basis for setting aside the entry of default and/or the final judgment on a basis of undue "prejudice" to Heard-Orlando. When the bankruptcy court found, as a legal conclusion not based on solid facts, that there was enough prejudice to the debtor's estate to justify refusing to set aside both the entry of default and the final default judgment, it abused its discretion. Removing money from one person's pocket and putting it in the pocket of another is always "prejudicial" to the owner of the empty pocket, even when that person was never entitled to the money.

### Were Blau, *et al*, Culpable?

The bankruptcy court had good reason to be "put out" with Blau, one of the appellants here. Admittedly, **Blau himself** did not perform at the level the bankruptcy court had a right to expect from a

lawyer. Exasperation with Blau, however, does not translate into culpable conduct by Blau, *et al*, (none of whom had counsel after Baker Donelson was summarily allowed to withdraw) of the character that makes them guilty of misconduct that would justify wiping out a million dollar settlement recognized in an arbitrator's formal order that has never been attacked in any court that this court knows of.

"If a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, the court need make no other findings in denying relief." *Compania Interamericana Export-Import S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951-52 (11th Cir. 1996). But, Blau, *et al*, could not have "intentionally" or "recklessly" failed to respond when they had no lawyer. Blau himself probably could have been treated as a *pro se* party, but Tomlinson's conduct was certainly not culpable, and Blau's personal conduct cannot be attributed to any appellant except Blau himself. From the facts, it appears that Blau had some personal degree of culpability. However, it was necessary for the bankruptcy court, in order to avoid abusing its discretion while denying relief to the other appellants, to distinguish between Blau and the other four, none of whom were represented by Blau. How to distinguish between Blau personally and his Florida clients is a question the bankruptcy court did not address, and a question this court will not try to answer.

At the hearing of May 6, 2009, Tomlinson told the bankruptcy court that even though Blau had told him that the answer was not due until May 1, 2009, Tomlinson himself electronically searched the bankruptcy court docket sheet for the actual extension date. In other words, he double checked. When he found no order, he understandably took Blau's word for it and filed the answer on April 30, 2009, one day "early" by his calendar, but one day "late" by the bankruptcy court's oral calendar. Further mitigating any vicarious culpability by Blau, *et al*, is the fact that the bankruptcy court permitted Blau, *et al*'s counsel to withdraw without conducting a hearing and without requiring the simultaneous appearance of substitute counsel. Blau, *et al*, were naked on April 29, 2009, unless they can be blamed for Blau's questionable conduct. At the hearing of April 15, 2009, the bankruptcy court knew that Blau, *et al*, still had not retained counsel. At the hearing of May 6, 2009 the bankruptcy court said: "I even let them withdraw, which I shouldn't have, twenty/twenty hindsight now... Usually the court is remiss to let the plaintiff - to let somebody out before they have someone new, but I did." (transcript of hearing of May 6, 2009). In whole or in part, Tomlinson's day late filing can be traced to the bankruptcy court's acknowledged mistake. It constituted an abuse of discretion for the bankruptcy court to put the blame for the late filing on parties who had no counsel.

**Conclusion**

Having held that the refusal to set aside the clerk's entry of default constituted error by the bankruptcy court, the order denying Blau, *et al*'s motion to set aside the said entry of default is hereby VACATED. It follows that the entry of a default judgment was also error. Accordingly, the order denying the motion to set aside the final default judgment in favor of Heard-Orlando is VACATED, and the final default judgment is also VACATED. The case is REMANDED to the bankruptcy court for consideration of the issues in the REINSTATED adversary proceeding, including those issues presented by Blau, *et al*'s answer, counterclaim, and third-party claim, all in light of this opinion.

Because this order is not a final judgment and therefore does not support an appeal to the Eleventh Circuit by Heard-Orlando, but because this court is of the opinion that the order does involve a question or questions of law as to which there is substantial difference of opinion, and is of the further opinion that an immediate appeal from this order pursuant to 28 U.S.C. § 1292(b) may materially advance the ultimate termination of the litigation, the clerk is instructed to withhold the effectuation of the remand order until 4:30 p.m., December 11, 2009, in order to give Heard-Orlando time within which to make a request for interlocutory appeal to the Eleventh Circuit if it desires to do so.

DONE this 23rd day of November, 2009.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE